IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:17-CR- *0020S (LO)* |
| | ) | |
| STEVEN J. GRAVES, | ) | |
| | ) | |
| Defendant. | ) | |

### STATEMENT OF FACTS

The United States and the defendant, STEVEN J. GRAVES, stipulate that the allegations

in the two-count criminal information and the following facts are true and correct and that, had

the matter gone to trial, the United States would have proven them beyond a reasonable doubt

with competent and admissible evidence.

**A.    Background**

1.      The United States Department of State ("DoS") was a department of the United

States government.

2.      The Office of Acquisitions Management ("AQM") was a component within the

DoS that was responsible for most of the DoS's operational acquisitions, including acquisition

planning, contract negotiations, cost and price analysis, and contract administration.

3.      On or about November 6, 2011, the defendant, STEVEN J. GRAVES

("GRAVES"), was employed in Arlington, Virginia as a contract specialist and senior contracts

administrator with the DoS's AQM.  In his position as a contract specialist with the AQM,

GRAVES was authorized to perform most of the functions that a contracting officer could

perform.  GRAVES did not hold a warrant, however, and he was not authorized to bind the DoS

to a contract.  Prior to his employment with the DoS, GRAVES, since at least 2005, served as a government contractor in AQM.  GRAVES' job duties while he was a government contractor were essentially the same as his responsibilities when he became a full-time DoS employee.

4.      PERSON A was a close friend and associate of GRAVES before GRAVES began working at a DoS contractor in or about 2005.  By at least March 2011, GRAVES and PERSON A contemplated starting a business together that would pursue United States government contracts.

5.      Honest, Experienced, Reliable, Contracting Solutions LLC ("HERC") was a limited liability company formed in the State of Texas in or about March 2011.  HERC was a construction and engineering firm that claimed to specialize in international construction projects for the United States government in developing countries and military zones.  PERSON A served as HERC's chief executive officer and owner (or co-owner) since its formation.  PERSON A also served as HERC's first president.

6.      In or about November 2011, HERC received certification through the U.S. Small Business Administration's HUBZone Program.  The HUBZone Program gave preferential access to federal procurement opportunities to small businesses in urban and rural communities that were historically underutilized.

7.      By at least in or about November 2011, and continuing during the time-period when GRAVES was a DoS employee, GRAVES, among other things: (a) negotiated a partnership agreement with PERSON A and was a silent or de facto partner in HERC; (b) assisted HERC and PERSON A in obtaining start-up capital and developing business and joint venture opportunities; (c) made loans or capital contributions to HERC and PERSON A, some of which was used to pay HERC's contracting expenses; (d) received payments from HERC and

PERSON A; (e) used his official position to take action upon, and make decisions and recommendations regarding, DoS procurement matters and solicitations involving HERC and PERSON A; (f) provided PERSON A, HERC, and HERC's joint venture partners with confidential bid and procurement information; and (g) participated in HERC's internal meetings, conference calls, and e-mail communications regarding business operations and development, including discussions regarding contracts that GRAVES oversaw in his official capacity.

8.    GRAVES separated from employment with the DoS on or about February 4, 2013. On or about February 27, 2013, a certificate of amendment for HERC was filed in Texas indicating that GRAVES was HERC's chief acquisition officer and majority owner (51 percent). The certificate of amendment reduced the ownership of PERSON A and another HERC executive ("HERC EXECUTIVE A") to 24.5 percent each.

9.    After separating from the DoS, and while he was HERC's majority owner, GRAVES represented HERC in communications directly with AQM contracting officials and other DoS employees concerning HERC's contract performance and payment on contracts awarded to HERC that GRAVES previously oversaw while he was a DoS employee.

10.    On or about August 14, 2014, after HERC EXECUTIVE A resigned from the company, a certificate of amendment for HERC was filed in Texas indicating that HERC was co-owned by GRAVES (51 percent) and PERSON A (49 percent). By at least the time of this filing, GRAVES was serving as HERC's president instead of PERSON A.

**B.    The Scheme to Defraud**

11.    From in or about March 2011 through at least in or about March 2016, in the Eastern District of Virginia and elsewhere, GRAVES, PERSON A, and others knowingly and unlawfully conspired:  (a) to defraud the United States of money and property and the right to

control the disposition of its assets; (b) to defraud the United States by impairing, impeding, obstructing, and defeating the DoS's lawful government functions, including the DoS's procurement of supplies and services in a manner free from fraud, dishonesty, deceit, conflict of interest, and corruption; and (c) to commit wire fraud.

12. As part of the conspiracy:

a. GRAVES and PERSON A used GRAVES' official position at the AQM to steer contracts and purchase orders to HERC while concealing from the DoS and others that GRAVES had a conflict of interest and was partial and biased due to his business, financial, and personal relationship with HERC and PERSON A;

b. GRAVES sought out contracting opportunities for HERC and PERSON A, introduced PERSON A to DoS employees and current or prospective DoS contractors, provided advice on the preparation of bid proposals, and supplied PERSON A with confidential bid and procurement information.

c. PERSON A and others used confidential bid and procurement information in an effort to gain a competitive advantage over other prospective contractors.

d. GRAVES and PERSON A intentionally kept secret and concealed from others the true nature of their relationship, including in communications or dealings with the DoS or its employees.

e. GRAVES and PERSON A made false and misleading statements to federal law enforcement officials conducting a criminal investigation examining the relationship between GRAVES and PERSON A.

C.    **Early Efforts to Develop Business Opportunities and Arrange Start-Up Capital**

13.    Between on or about July 28, 2011, and in or about April 2012, GRAVES communicated with PERSON A about potential teaming arrangements and sources of start-up capital for HERC.

14.    As early as July 2011 and continuing through at least December 2011, GRAVES and PERSON A worked together to create a teaming arrangement between HERC, a Hawaiian firm, and a Colorado construction company, to pursue United States government contracts. When working together on this opportunity, GRAVES and PERSON A used GRAVES' personal e-mail account for communications between each other and with the owner of the Colorado construction company.  The teaming agreement did not successfully develop into a business opportunity for HERC or PERSON A.

15.    GRAVES and PERSON A also communicated about a potential investor in HERC who operated a Turkish construction company (hereinafter "Turkish investor").  Over the course of several months, between in or about August 2011 and continuing through at least in or about December 2011, GRAVES used his personal e-mail account to communicate between each other and with the Turkish investor.  GRAVES and PERSON A tried to convince the Turkish investor that HERC would have United States government contracting opportunities.  On at least one occasion, in or about mid-October 2011, GRAVES, PERSON A, and the Turkish investor met in Washington, D.C. to discuss the potential investment in HERC and related business opportunities.  Despite GRAVES and PERSON A's efforts, they were not ultimately successful in securing a large investment from the Turkish investor.

16.    In the midst of his efforts to secure a teaming agreement and investor for HERC, GRAVES submitted an Office of Government Ethics ("OGE") Form 450 to the DoS on or about

October 2, 2011, as a pre-employment requirement. On the form, GRAVES did not disclose any relationship with HERC despite a requirement that he report outside positions, including any role as an employee or unpaid consultant. GRAVES also failed to disclose any relationship with HERC on or about December 8, 2011, when he provided clarifying information about his outside positions to the DoS official reviewing his OGE Form 450.

17.     By at least November 20, 2011, several weeks after GRAVES started as a full-time DoS employee, and during his continued efforts to secure a teaming agreement and investor for HERC, PERSON A sent an e-mail to GRAVES' personal e-mail account, which attached a draft partnership agreement for GRAVES' review that GRAVES and PERSON A had previously discussed. The draft partnership agreement indicated that PERSON A and GRAVES would be co-partners in HERC at 55 and 45 percent, respectively, and that partnership contributions "will be / have been submitted on or by November 1, 2011." PERSON A re-sent the draft partnership agreement to GRAVES' personal e-mail account on or about January 4, 2012.

18.     On or about January 4, 2012, in an effort to obtain start-up capital for HERC, PERSON A sent an e-mail to GRAVES' personal e-mail account. The email provided GRAVES with information from a Nevada lending company about how to fill out application paperwork for a business line of credit for HERC. PERSON A stated in part, "Please review this and let me know if you have any questions that I can present to them prior to them calling you. They should be calling within the next 24-48 hours so I will give them your DC cell phone number and you can take it from there."

19.     On or about January 17, 2012, in an effort to obtain start-up capital for HERC, GRAVES and PERSON A contacted a financial lending and consulting company in Arkansas

-6-

that provided unsecured loans.  The Arkansas lending company considered PERSON A as the primary and GRAVES as the personal guarantor and client.

20.     On or about January 19, 2012, during a telephone conversation with a representative of the Arkansas lending company, GRAVES advised he was a silent partner in HERC and he did not wish for his name to be attached to the business lines.

21.     On or about January 24, 2012, after PERSON A participated in a consultation with the Arkansas lending company, GRAVES forwarded a draft lending application and disclosure forms from his personal e-mail account to PERSON A.  In one of his reply e-mails to GRAVES on the same day, PERSON A stated, "Okay.  Here is the information.  The only one that I had any questions on was the one about the business partner.  I will let you decide on how that one needs to be since this is all going under your name. . . ."  PERSON A's attachment indicated that HERC did not have any business partners.

22.     On or about January 25, 2012, GRAVES informed a representative from the Arkansas lending company that he was negotiating his personal guarantor agreement with PERSON A and asked if he could be given another day before submitting the disclosures.  GRAVES thereafter informed a representative from the Arkansas lending company that he was going to put HERC's application on hold.

23.     On or about February 20, 2012, after a representative from the Arkansas lending company left a follow-up voice mail message, GRAVES sent an e-mail to the representative, which stated, "Thanks for touching base.  We are managing to finance our projects so far but we [sic] keep you in mind as we progress."

-7-

24.     On or about April 26, 2012, after a representative from the Nevada lending

company sent an e-mail to PERSON A regarding vendor account information, PERSON A

forwarded the e-mail to GRAVES' personal e-mail account, stating:

> Hey Steve, Let's see what we can do to get this started with things
> that you and [GRAVES' son] might need to get on credit.  This
> will assist HERC gain company credit and higher [sic] their
> business score plus it will allow you and [GRAVES' son] to get
> things on 30 days credit.
>
> Also, this is the same company that is going to help me clear up
> my credit score, in which I need for you to act like your [sic] me
> when you talk to them on the phone. . . .

## D.     HERC's Contracting Activity with the DoS

25.     Businessman A was the owner and president of Company A, a construction and

consulting company located in Maryland.  Businessman A and Company A were affiliated with a

group of family-owned, international construction and consulting companies located in Kabul,

Afghanistan.  GRAVES introduced Businessman A to PERSON A and HERC for business

development opportunities.  Between in or about May 2012 and in or about September 2012,

Company A paid approximately $35,000 to PERSON A and HERC in exchange for consulting

and business development services in Afghanistan.

26.     Businessman B was the owner of Company B, an international construction

company located in the Eastern District of Virginia.  GRAVES introduced Businessman B to

PERSON A and HERC for business development opportunities.  Between in or about January

2012 and in or about July 2012, Company B paid approximately $52,500 to PERSON A and

HERC in exchange for consulting and business development services in Afghanistan and

elsewhere.  Businessman B also executed a $150,000 convertible promissory note with HERC

and PERSON A in or about early 2012.  Although Businessman B did not convert the note into

an equity position with HERC, Businessman B paid $100,000 to HERC and PERSON A pursuant to the promissory note.

27.     While serving as a consultant for Company B, PERSON A resided with GRAVES in the Eastern District of Virginia.  PERSON A also introduced Businessman A to Businessman B for the purpose of seeking joint venture opportunities in Afghanistan.  After this introduction, Company A and its affiliated companies served as subcontractors for construction projects solicited by Company B in Afghanistan.

28.     In or about July 2012, while GRAVES was a DoS employee, Company B was awarded DoS Contract No. SAQMMA12F1865, which was a task order to fabricate and supply Containerized Housing Units ("CHUs") at the U.S. Embassy in Kabul, Afghanistan ("USEK") as part of an Indefinite Delivery, Indefinite Quantity ("IDIQ") contract previously awarded to Company B in or about January 2011.  Company B, with the assistance of HERC and Company A and its affiliates, ultimately fabricated, supplied, and installed approximately 168 CHUs and other support buildings for the DoS in exchange for approximately $5.7 million.  GRAVES was listed as the DoS's point of contact and contract specialist for the award, and he signed and issued the DoS's notices to proceed, including a limited notice to proceed with the fabrication of the initial 80 CHUs (issued by GRAVES on or about May 14, 2012).

29.     Between in or about mid-2012 and in or about September 2012, Company B, with the assistance of HERC and Company A and its affiliates, unsuccessfully sought an additional DoS contract to fabricate and supply CHUs at Camp Sullivan, which was a self-contained compound for the local guard force that protected U.S. facilities in Kabul.  GRAVES served as the DoS's point of contact and contract specialist on this solicitation.

E.    **Joint Venture with HERC, Company A and Its Affiliates, and Company B Regarding DoS Contracts in Afghanistan**

30.    On or about January 4, 2012, GRAVES sent an e-mail from his personal e-mail account to Businessman B, copying PERSON A and with a subject line, "Introduction." The e-mail introduced PERSON A to Businessman B to pursue business opportunities with the DoS in Afghanistan. GRAVES further advised Businessman B that he would "vouch for [PERSON A's] integrity."

31.    Between in or about January 2012 and in or about February 2012, PERSON A, Businessman B, and GRAVES exchanged several e-mails and telephone calls regarding an investment in HERC and business opportunities in Afghanistan and elsewhere.

32.    On or about January 24, 2012, PERSON A sent an e-mail to GRAVES' personal e-mail account, asking GRAVES for assistance in getting PERSON A a temporary job. The e-mail stated in part, "[D]o you think we can work something out with [Businessman B] or even [Businessman A] in the next few days? I need to [get out of Texas] and get some money coming in to pay my bills . . . ."

33.    On or about January 27, 2012, PERSON A sent an e-mail to Businessman B, requesting a temporary job and advising that he could stay with GRAVES in Virginia while working for Company B. Thereafter, Company B retained PERSON A as a consultant.

34.    On or about April 13, 2012, PERSON A sent an e-mail to GRAVES' personal e-mail account, stating:

>            Steve, I will be in Kabul this afternoon, hitting the ground running.
>            I would like to give you a call to catch up on those issues that need
>            to be taken care of and what we can do to expedite some of these
>            opportunities. . . . I will make sure that I am in Kabul for the Camp
>            Sullivan walk through; . . . [Company B] does not have anyone in
>            country to do this so I will be representing them. . . . I will just let

folks know that I am just doing the site visit to assist [Company B] and their team in obtaining the information that is needed.

With that said, what do you think our chances of the sole source installation of the Chus will be?  I would really like to nail that down so we can get established here in an appropriate manner and start working to get ourselves established on our own so we can minimize costs with [Companies A and B].  Let me know what your thought process is and we will go from there.

35.     On or about April 16, 2012, PERSON A sent an e-mail to GRAVES' personal e-mail account regarding Company B's potential bid proposal to provide CHUs to the USEK. PERSON A stated, "Steve, Just to let you know, we can get containers that are equivalent or better than [a competitor's] containers that are produced both locally and within the region. Once I receive the drawings and specs you can use that to assist you on the 80 CHU opportunity."

36.     On or about April 21, 2012, GRAVES sent an e-mail from his personal e-mail account to PERSON A, which attached a draft DoS announcement regarding a request for proposal relating to a power plant project at the U.S. Embassy in Baghdad.

37.     On or about April 21, 2012, PERSON A forwarded GRAVES' e-mail to Businessman B and others in Company B, stating in part, "This has not come out yet, here in the next few days; however, our friend asked if we were going to bid this. . . ." In a reply e-mail, Businessman B asked for follow-up information regarding what GRAVES was telling PERSON A about the competition for the bid.

38.     On or about April 21, 2012, PERSON A forwarded an e-mail to GRAVES' personal e-mail account with the subject line "FW: Getting On the Same Page!!!"  The original e-mail, from Businessman A to PERSON A, discussed the business arrangement between HERC, Company A and its affiliates, and Company B.  As to DoS solicitations where Company

B would serve as the prime contractor, the agreement called for HERC to recuse itself as a named party "due to the relationships as well as other competitors finding reason to protest." Nonetheless, HERC and PERSON A would continue to have a role on Company B's projects "to make sure everyone is taken care of."

39.     On or about April 22, 2012, PERSON A sent an e-mail to GRAVES' personal e-mail account, stating, "I spoke with [Businessman A] this morning and all seems to be well."

40.     On or about April 24, 2012, GRAVES, using his personal e-mail account, sent an e-mail to PERSON A, stating, "Camp Sullivan will be issued this Friday (hopefully) and the due date will be approximately June 14.  SG"

41.     On or about May 5, 2012, in connection with Company B's successful bid to construct and supply CHUs to the USEK, PERSON A sent an e-mail to Businessman A and others regarding an upcoming site inspection and Company B's interest in receiving a large modification to the contract that would increase the number of CHUs and allow Company B to install them.  PERSON A wrote:

> Per [Businessman B's] request, [Company B], I will be representing them, and I will also be marketing the installation to either be done 1) as an amendment to the [Company B] contract for the CHUS or 2) as a sole source installation under HERC Solutions with [Company A's affiliate].  Our friend below [referring to GRAVES] said that these guys are part of the decision making team for the installation and we need to sell them on our capabilities instead of letting [a competitor] install the CHUs.

42.     On or about July 19, 2012, in response to a request for additional information relating to Company B and HERC's bid to construct and supply CHUs for Camp Sullivan, PERSON A sent an e-mail to Businessmen A and B, copying GRAVES' personal e-mail account.  The e-mail stated:

> Gentlemen, the below information requests information that I need
> to clarify before we provide it. Do we want to mention HERC
> Solutions in the proposal? Do we still feel that this might raise a
> red flag if certain other companies find out? If all agree that we
> will be okay, then I will provide the necessary information;
> however, let's all agree that we [do] not do anything that has the
> potential to cause a delay in the award of a contract with someone
> trying to protest on the grounds of my friendship."

43.     On or about July 19, 2012, GRAVES, using his personal e-mail account, sent a reply e-mail to PERSON A and Businessmen A and B, which stated, "I suggest that HERC leaves it's [sic] name off the proposal." Businessman B forwarded the e-mail to Company B employees who were working on the Camp Sullivan proposal, stating, "Please strike out all mention of HERC in our Sullivan proposal. Don't forget to modify ord chart as well. HERC will continue to participate as we have discussed. Just drop mention of their name."

44.     On or about July 21, 2012, PERSON A sent an e-mail to GRAVES' personal e-mail account, stating, "Hey, let me know what you think about $43M as the estimated cost for CS [Camp Sullivan]."

45.     On or about July 24, 2012, in connection with Company B and HERC's bid for the Camp Sullivan project, PERSON A sent an e-mail to HERC EXECUTIVE A, stating in part:

> By the way, spoke with our friend today and we need to make sure
> without hesitation that our pricing is around the $40M mark. You
> will have to work with [Businessman B] on this and help [a
> Company B employee] understand; [Businessman A] and I have
> already spoken about this. No matter what, these numbers are for
> the proposal only and we will redefine the actuals when we receive
> the award; however, it was explicitly stressed to come in around
> the $40MM make [sic] based on the competition. I am sure we can
> do it and I am sure we will all make money once everything is
> more defined, but again, it has to be done this way in order for us
> to win the award.

46.     On or about July 24, 2012, GRAVES, using his personal e-mail account, provided PERSON A with the DoS's internal cost estimate ("9M+") for a project in Peshawar, Pakistan.

PERSON A then forwarded the information to Businessman A and Businessman B, stating in

part, "Don't see how but I think we should still go in around $12 to $13."

47.     On or about July 25, 2012, PERSON A sent an e-mail to GRAVES' personal e-

mail account, stating in part:

> Steve, I need to see if I can get some assistance here. I know that [Businessman B] has received the [Notice to Proceed] on Baghdad and that he has received funds on the first payment for the CHUs [at the USEK]. The only think I am not sure of is if he received monies for the mobilization to Iraq. I need to get some funding in line, especially from [Businessman B], for the efforts I have put into these opportunities that he is receiving. You and I need monies to ensure that we can put the investment monies in on [an investment opportunity] in Kabul. . . .
>
> [Businessman A] is only paying me one of the invoices out of the monies that he just received and here is the kicker to boot, I know what [Businessman A] submitted for and I know what [Businessman B] submitted for and between you and me, they both are making a good chunk of change on the CHU deal and they both are going to make a good chunk of change on the other deal. We need to get them to give up some of the wealth per say so we can continue to move forward with our plans; with that said, I need some assistance to get them to realize that they cannot leave me out here to fend for myself while they sit back and capitalize on what you and I are doing for them. Any assistance you can provide by putting pressure on them to get me monies would most appreciative [sic].
>
> Also, I think the only way that we (you and I) can really capitalize on all of the various opportunities in the manner that we both want is to have the ability to break away from both [Company B] and [Businessman A]. I am supposed to be speaking to the [Businessman A's father] in the next few days concerning our business relationship. I am thinking that they are wanting to dissolve the payment aspect but still want to have the ability to work on these projects together. The issue I have right now is that [Businessman A] said that he was going to be bringing USACC work to the relationship and the only one that is bringing anything is me and you. Have you had an opportunity to speak with [a DoS Contracting Officer] in regards to a small business IDIQ that HERC can get on? Is there any way that we can find more set aside business?

> My main goal is to make sure that we are in good shape come Oct. but I am going to need some stateside pressure on these two knuckleheads in order to do that. Between you and me, I know that [Businessman B] stands to make about $1M or more on the CHU and [Businessman A] stands to make $500K-$1M on them also. They need to share the wealth so I can set some aside for the good things. . . .  Let me know what you think.

48.     On or about September 5, 2012, GRAVES, using his personal e-mail account, sent an e-mail to PERSON A, which attached clarifications regarding the Camp Sullivan project. PERSON A then forwarded the e-mail to Businessman A and Businessman B, stating in part, "Gentleman, Here is the sneak peek at the clarifications that will be officially issued Thursday or Friday.  You will have approximately one week to respond to them. . . ."

49.     On or about September 28, 2012, in connection with the CHUs at the USEK, Businessman B sent an e-mail to PERSON A indicating that one of Company B's subcontractors might shut down the CHU production at the USEK until the subcontractor receives a second installment payment.  PERSON A forwarded the e-mail to GRAVES' personal e-mail account, stating, "FYI. . . . can you see what is happening on their payment for the CHU[s]. . . I do not want a black on this one."

## F.     DoS Contracts and Purchase Orders Awarded Directly to HERC

50.     Between in or about September 2012 and in or about February 2013, while GRAVES was a DoS employee, HERC was awarded a purchase order contract and a set aside contract from the DoS where GRAVES served as the DoS's contract specialist and point of contact, and he issued the notices to proceed.  When including modifications for these contracts, HERC received a total of approximately $3,443,617.96 from the DoS, with the last payment made on or about July 2014.  The two awards included:  (a) DoS Contract No. SAQMMA12C0255 (set aside contract for the design and construction of a building at the USEK

to repair or install radio systems in Embassy vehicles); and (b) DoS Purchase Order No. SAQMMA12M2357 (purchase, delivery, and installation of power generators at the USEK);

### Radio Repair Building (a/k/a "Vehicle Electric Shop")

51.     In or about April or May 2012, GRAVES informed a DoS facilities manager at the USEK that HERC was available to provide goods and services, and it could be awarded DoS contracts and orders quickly and with minimal or no competition due to its certification as a HUBZone small business.

52.     Between in or about May 2012 and in or about early June 2012, GRAVES told PERSON A and HERC to submit a bid proposal to construct a prefabricated building to be used as an automobile shop for the installation of new radio systems in Embassy vehicles.

53.     On or about May 29, 2012, HERC EXECUTIVE A sent an e-mail to PERSON A, which included a link to a Federal Acquisition Regulation ("FAR") that authorized sole-source contracts for HUBZone small businesses.  PERSON A forwarded the link to GRAVES' DoS e-mail account, explaining that HERC could receive sole-source contracts.

54.     On or about June 4, 2012, HERC EXECUTIVE A, copying PERSON A, submitted HERC's bid proposal to the USEK facilities manager.  The bid proposal intentionally omitted any reference to GRAVES as an actual or de facto partner of HERC.  The USEK facilities manager, copying GRAVES, forwarded the proposal to other DoS employees in the USEK, stating in part:

> The company supplying this proposal is a Hub Zone contractor in the States, and this being the case, Acquisitions in DC can move forward rapidly with awarding this, as this contractor is essentially a high level Small Disadvantaged Business and is relatively free from open competition requirements.
>
> The folks at RPSO [DoS's Regional Procurement Support Office] are not well versed in using Hub Zone Contractors, so I would

-16-

request that we forward this procurement action to Steve Graves
over in [AQM] to pursue. . . .

55.     On or about July 16, 2012, GRAVES sent an e-mail to another DoS employee to
obtain authorization for a set aside award for HERC.  The authorization was approved.

56.     On or about July 25, 2012, after GRAVES had received an e-mail from the USEK
facilities manager (attaching a Statement of Work and concept drawings), GRAVES forwarded
the e-mail and attachments to the assigned contracting officer.  GRAVES' e-mail to the
contracting officer stated in part, "I have been talking with [the USEK facility manager] about
using a [sic] American HubZone business for a small project in Kabul.  The company is already
established there and is capable of doing this work.  The attached DS 1910 [seeking a HUBZone
set-aside award] requires your approval so I can send it over to Small Business Office."

57.     Between on or about August 6, 2012 and on or about August 7, 2012, after the
contracting officer approved the set-aside award, GRAVES sent a series of e-mails to the USEK
facility manager, seeking approval and clarification of the funding.

58.     On or about September 6, 2012, GRAVES, using his personal account, sent a
copy of the Statement of Work to PERSON A, asking if he had seen it.  PERSON A confirmed
he had seen the Statement of Work.

59.     On or about September 8, 2012, GRAVES, using his DoS e-mail account, sent a
copy of the request for proposal to PERSON A, instructing PERSON A to contact GRAVES if
he had questions.  PERSON A replied that he wanted to discuss it with GRAVES by telephone.

60.     Between on or about September 8, 2012 and on or about September 13, 2012,
GRAVES and PERSON A had follow-up communications regarding HERC's proposal and the
DoS's funding.

61.     On or about September 24, 2012, GRAVES and the contracting officer signed a price negotiation memorandum, justifying the use of a HUBZone company.

62.     On or about September 24, 2012, after the DoS contract was awarded to HERC and signed by the contracting officer, GRAVES signed and submitted the DoS's notice to proceed letter and forwarded the award information to DoS's procurement division for payment.

63.     On or about September 27, 2012, GRAVES, using his DoS e-mail account, sent an e-mail to PERSON A asking for HERC's proposal "for the additional work around the radio shack." PERSON A replied to GRAVES' e-mail, stating, "This is what I sent to [the USEK facilities manager] based on what [the USEK facilities manager] requested. If you need more of a write up let me know but [the USEK facilities manager] said to keep it short and sweet." GRAVES responded: "I still need to talk to you about this proposal. Call me."

64.     Between in or about September 27, 2012 and in or about September 30, 2012, GRAVES prepared a modification to the purchase order agreement, which the contracting officer signed on or about September 30, 2012. GRAVES signed and submitted the DoS's notice to proceed on or about November 7, 2012.

65.     Between in or about October 15, 2012, and in or about October 31, 2012, GRAVES, using both his DoS and personal e-mail accounts, assisted PERSON A by checking with other DoS employees regarding the status of invoice payments to HERC. In one of the e-mails, GRAVES informed PERSON A that he "just got off the phone with [DoS employee] and he is going to resubmit the two outstanding invoices and try to move this downstream. Also, he intends on adding $190K to the Radio Shack contract with the next two weeks."

66.     In or about November 2012, GRAVES prepared a second modification to the radio building contract, which the contracting officer signed on or about November 28, 2012.

67.     On or about January 25, 2013, GRAVES, using his DoS e-mail account, sent an e-mail to PERSON A and HERC EXECUTIVE A with a subject line, "Radio Building Invoice." The e-mail stated, "I have approved and sent the invoice to [South Carolina] for payment.  When I find out when it will be paid I will let you know."

**Power Generator Contract**

68.     Between in or about July 2012 and on or about August 11, 2012, GRAVES and the USEK facilities manager discussed using HERC to supply power generators to the USEK. The USEK facilities manager asked GRAVES to serve as AQM's point of contact.

69.     Between on or about August 12, 2012 and on or about August 30, 2012, GRAVES told PERSON A to submit a bid proposal for the USEK power generators.

70.     On or August 30, 2012, PERSON A sent an e-mail to GRAVES and the USEK facilities manager attaching a bid proposal for the USEK power generators.  The bid proposal intentionally omitted any reference to GRAVES as an actual or de facto partner in HERC. GRAVES was instructed by the USEK facilities manager to negotiate the proposal with PERSON A.

71.     On or about August 31, 2012, PERSON A sent an e-mail to GRAVES' personal e-mail account, explaining HERC's cost proposal: "Steve, Didn't want to send this through the other.  Cost with no mark up on the refurbished is $160K and the cost with no mark up on the new is $220K.  I can send you the estimate work up if you would like[.]"

72.     In or about early September 2012, after the quantity of generators was reduced from three to two, GRAVES informed PERSON A about the modification.  PERSON A replied, "Understood, will make the changes accordingly and resubmit."  PERSON A sent his revised proposal directly to GRAVES.

73.    On or about September 20, 2012, GRAVES, using his DoS e-mail account, sent an e-mail to PERSON A and HERC EXECUTIVE A, copying the USEK facilities manager and attaching the DoS's signed purchase order, dated September 19, 2012, and a bank routing form.

74.    Between on or about September 20, 2012 and on or about September 21, 2012, GRAVES, PERSON A, and HERC EXECUTIVE A sent a series of e-mails to each other regarding the purchase order and HERC's need to receive an advance payment from the DoS (due to liquidity problems) to fund the purchase and shipping of the materials.

75.    On or about September 21, 2012, GRAVES sent an e-mail to PERSON A, copying the USEK facilities manager. A portion of the e-mail stated, "[USEK facilities manager] give me a call and we can discuss this. We don't normally finance contracts but since this is a small Hub-Zone business, that I am confident will perform, I don't see a down side. Give me a call and we can discuss further."

76.    On or about September 24, 2012, GRAVES sent an e-mail to a DoS contract official in DoS's RPSO in Frankfurt, Germany. The e-mail, which copied PERSON A and recommended HERC for contracting opportunities, stated in part, "I have found a Hub-Zone (American) vendor operating in Afghanistan. I have awarded a couple of small (under a $1m) contract to them and they are doing well. Here is the contact information if you want to send them any solicitations. . . .  Let me know if you need anything else."

77.    On or about October 26, 2012, PERSON A sent an e-mail to GRAVES' personal e-mail account, asking about DoS payments for HERC contracts: "Steve, I know that you are probably as tired of hearing this as I am, but I need an update on the status of our funds. The team is Kabul is getting worried and the first is coming around the corner which means I need to get folks paid. Please see what you can do as I would appreciate it immediately."

78.      On or about November 29, 2012, in connection with a modification to HERC's power generator contract, a HERC employee sent an e-mail to PERSON A, stating: "[PERSON A], [a HERC project manager] touched base with [the USEK facilities manager] about the additional generators for the Embassy.  Basically the request has been pushed up the flagpole for approval.  Can our friend influence the process any?"  PERSON A forwarded the e-mail to GRAVES' personal e-mail account, adding, "FYI, anything that you can to expedite this or is it still at the embassy level?  This is the $1.3M generator project."

79.      On or about December 4, 2012, a HERC employee sent an e-mail to HERC EXECUTIVE A, copying PERSON A, GRAVES' personal e-mail address, and other HERC employees.  The e-mail stated, "[HERC project manager] has been in contact with [the USEK facilities manager] . . . who has advised the request for the additional generators . . . ha[s] been pushed up the flag pole.  I don[']t know if there is anything Steven can do to help push things along or indeed see where they are sitting in the system.  Might be worth reaching out to him."  GRAVES replied, "I am talking with [the USEK facilities manager].  Trying to get something finalized before he goes on holiday."

80.      On or about January 3, 2013, PERSON A sent an e-mail to GRAVES' personal e-mail account requesting assistance on HERC's power generator contract.

## G.      **GRAVES' Role with HERC Beginning in October 2012**

81.      Between in or about October 2012 and in or about February 2013, while he was a DoS employee, GRAVES' role in HERC increased.  Among other things, he routinely participated in HERC conference calls, business development meetings, and internal e-mail discussions.  The topics included the DoS contracts that GRAVES administered and oversaw in his official capacity.  Examples include the following:

a.     On or about October 20, 2012, in an e-mail circulated prior to one of the Skype conference calls, PERSON A asked HERC EXECUTIVE A to "patch in" GRAVES. HERC EXECUTIVE A replied, "Ok. . . . Is he joining stealth[?]" PERSON A replied, "He is sending a different number so we don't have to be stealth."

b.     On or about October 20, 2012, PERSON A sent an e-mail to GRAVES' personal e-mail account, providing the e-mail addresses for HERC's other employees and informing GRAVES that he was going to ask HERC EXECUTIVE A to create a HERC e-mail account for GRAVES. PERSON A added, "Can you send [the other HERC employees] a motivating e-mail so we can keep them motivated even though things are tough right now."

c.     On or about October 24, 2012, GRAVES sent an e-mail from his DoS e-mail account to his personal e-mail account, attaching confidential bid information. GRAVES then used his personal e-mail account to forward the confidential bid information to PERSON A with the instruction: "Please review and destroy."

d.     On or about October 26, 2012, PERSON A sent an e-mail to HERC's employees, copying GRAVES' personal e-mail account, addressing business opportunities. The e-mail stated in part:

> Steve's boss said no to the IDIQ opportunity and the reason for that is because they are going to sending out 25 IDIQ opportunities for small construction works worldwide here very shortly. Steve will be sending out the information that is need for the prequals [sic] when they are ready so we get that information in to them. It is another golden opportunity that we can win and move into different regions based on what the work is.

e.     On or about October 31, 2012, PERSON A sent an e-mail to GRAVES' personal e-mail account, stating, "Are you going to be on the conference call today? Think it might be good for the financial and motivational aspect, especially if you build up the

ACS/HERC team and possible opportunities if you have any." GRAVES replied, "Waiting for the call."

       f.     On or about November 21, 2012, GRAVES, using his DoS e-mail account, sent PERSON A a list of the DoS's upcoming capital projects for the fiscal year. PERSON A forwarded the message to HERC's projects managers in Kabul, stating, "Guys, For your eyes only, here is the upcoming projects for State Department. Take a look at the ones that you think are interesting. . . ." One of the project managers replied, "In relation to the attached list, can you ask Steve which projects if any he has influence over given the fact that he will be leaving the [DoS] shortly."

       g.    On or about December 2, 2012, after PERSON A forwarded the project manager's question to GRAVES' personal e-mail account, GRAVES replied, "Once I am gone I will have no information concerning any projects at State."

    82.    Between in or about January 2013 and in or early February 2013, prior to GRAVES' resignation from the DoS and before his public listing as a HERC executive and co-owner, GRAVES became an authorized signer on two of HERC's bank accounts (as a "partner/member manager"); he received a HERC debit card; and he requested W-2 tax forms.

    83.    On or about February 1, 2016, GRAVES consented to a voluntary interview at his home in Cypress, Texas by special agents of the Federal Bureau of Investigation and the DoS, Office of Inspector General. During the interview, GRAVES falsely stated, among other things, that he departed employment from the DoS without having a job lined up at HERC and that, while working at the DoS, he only recommended on HERC's behalf that it be allowed to compete for DoS contracts.

## CONCLUSION

84.     The acts taken by the defendant, STEVEN J. GRAVES, in furtherance of the

offense(s) charged in this case, including the acts described above, were done willfully and

knowingly and with the specific intent to violate the law.  The defendant acknowledges that the

foregoing statement of facts does not describe all of the defendant's conduct relating to the

offenses charged in this case nor does it identify all of the persons with whom the defendant may

have engaged in illegal activities.


Respectfully submitted,

Dana J. Boente
United States Attorney

By:

Brian D. Harrison
Edward P. Sullivan
Counsel for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:  703-299-3700
brian.harrison@usdoj.gov
edward.sullivan@usdoj.gov
edward.p.sullivan@usdoj.gov

-24-

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Steven J. Graves, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Steven J. Graves
Defendant

I am Steven J. Graves' attorney.  I have carefully reviewed the above Statement of Facts with him.  To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Sara Kropf, Esq.
Attorney for Steven J. Graves