IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 1:17-CR-205 (LO) |
| | ) | |
| STEVEN J. GRAVES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## **GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through the undersigned counsel, respectfully submits this memorandum in aid of the sentencing hearing for the defendant, Steven J. Graves, which is scheduled for January 19, 2018, at 9:00 a.m.

On September 20, 2017, the defendant waived indictment and pled guilty to a two-count criminal information charging him with conspiracy to defraud the United States and commit wire fraud, in violation of 18 U.S.C. § 371 (count 1) and a willful violation of the conflict of interest statute, 18 U.S.C. § 208 (count 2). Pursuant to a plea agreement and Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties agreed to the following:[1] (1) the defendant's base offense level is a level 6 pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 2B1.1(a)(2); (2) the loss amount totaled between $250,000 and $1.5 million, thereby warranting either a 12 or 14-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1); (3) the defendant abused a position of public trust in a manner that significantly facilitated the commission or concealment of the offense, warranting a two-level adjustment

---

[1] The guideline calculations set forth in the plea agreement are not binding on the Court and are offered only to assist the Court in determining the appropriate guidelines range.

pursuant to U.S.S.G. § 3B1.3; and (4) for grouping purposes, counts 1 and 2 are closely related offenses. The defendant is aware that if the Court accepts the parties' recommended proposals, the total guideline calculation, when including a three-level reduction for the defendant's timely acceptance of responsibility, would be either Level 17 (24-30 months) or Level 19 (30-37 months), depending on the calculated loss amount. The government respectfully submits that the loss amount in this matter is $1,372,496.61 and, based on the other sentencing factors discussed below, the government recommends that the Court apply a guideline range of Level 19.

I. **Factual Background**

The defendant's plea agreement incorporates a detailed, 24-page statement of facts. In summary, the defendant was a contract specialist and senior contracts administrator with the U.S. Department of State ("DOS"), Office of Acquisitions Management from November 2011 to February 2013. During this time, the defendant used his official position to steer DOS contracts to an international construction company located in Texas, HERC Solutions, and its founder[2] while the defendant was an actual or de facto partner in HERC. Among other things, the defendant served as the assigned point of contact for DOS contracts awarded to HERC while the defendant was simultaneously attempting to generate business and raise capital for HERC, was negotiating an ownership interest in the company, and was actively concealing his conflict of interest from the DOS. Upon leaving the DOS in February 2013, the defendant became HERC's majority owner.

---

[2] HERC's founder is referred to as "PERSON A" in the statement of facts.

## II. Argument

### A. The Loss Amount Is Over $1.37 Million, Warranting a 14-Level Adjustment

The only potential factual dispute is the amount of loss for sentencing and restitution purposes. The parties concur that the loss amount here is more than $250,000, but less than $1.5 million. For the reasons set forth below, the government contends that the loss amount for both restitution and guideline purposes is $1,372,496.61.[3] This amount reflects the net income that HERC received on the two DOS contracts that the defendant admittedly steered to HERC.

Section 2B1.1(b)(1) of the Sentencing Guidelines provides for escalating offense-level increases depending on the amount of pecuniary loss that resulted from the offense conduct. Application Note 3 explains how the amount of loss should be calculated under subsection (b)(1).[4] *See* U.S.S.G. § 2B1.1 cmt. n.3. Application Note 3 generally defines "loss" as "the greater of actual loss or intended loss," *id.* at n.3(A), and it provides that the sentencing judge "need only make a reasonable estimate of the loss." *Id.* at n.3(C). "Actual loss," which is often referred to as a "but for" loss, means "the reasonably foreseeable pecuniary harm that resulted from the offense."[5] *Id.* at n.3(A)(i). "Pecuniary harm" is defined in the guidelines as "harm that is monetary or that otherwise is readily measurable in money," which therefore excludes various

---

[3] Although restitution and loss are separate issues, and there need not be "symmetry" between the two, here the parties concur that the same range of loss applies for both guideline calculation and restitution purposes.

[4] An Application Note to a sentencing guideline is authoritative and binding on federal courts if it is not plainly erroneous or inconsistent with the guideline it is interpreting. *See Stinson v. United States*, 508 U.S. 36, 38 (1993); *United States v. Hudson*, 272 F.3d 260, 263 (4th Cir. 2001); *United States v. Banks*, 130 F.3d 621, 624-25 (4th Cir. 1997); *United States v. Ward*, 908 F. Supp. 350, 354 (E.D. Va. 1995).

[5] Intended loss, by contrast, is defined in the guidelines as "pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1, cmt. 3(A). The defendant's subjective intent is relevant to the intended loss inquiry.

forms of non-economic harm. *Id.* at n.3(A)(iii). Pecuniary harm is reasonably foreseeable if it is "harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. §2B1.1, cmt. n.3(A)(iv). All reasonably foreseeable losses that flow directly, or indirectly, from a defendant's conduct should be included in the loss calculation.

Application Note 3 also includes rules of construction in certain situations. "In the case of a procurement fraud, such as a fraud affecting a defense contract award, reasonably foreseeable pecuniary harm includes the reasonably foreseeable administrative costs to the government and other participants of repeating or correcting the procurement action affected, plus any increased costs to procure the product or service involved that was reasonably foreseeable."[6] U.S.S.G. § 2B1.1, cmt. 3(A)(v)(II). Here, the DOS did not repeat the procurements, since HERC provided actual performance, but the DOS did incur increased costs that were reasonably foreseeable.

By issuing the contracts on a sole-source basis to a company that lacked experience and a proven track record (despite the defendant's assurances to the contrary), the DOS absorbed substantial cost overruns and additional expenses to make corrections or repairs.[7] It also

---

[6] Arguably, the contracts at issue here fall under the "benefits contract rule," *see* U.S.S.G. § 2B1.1, cmt. n.3(F)(ii), because they were both sole-sourced set aside contracts given HERC's status as a HUBZone small business. The starting point for determining loss under the "benefits contract rule" is typically the full amount of the benefits obtained. Courts have reached different conclusions as to whether set-aside contracts should be construed under the general "procurement fraud" rule or the "benefits" special rule.

[7] Indeed, numerous e-mails and documents reflect that HERC and the DOS constantly discussed performance-related problems that were causing cost overruns and the need for corrective action. For instance, on one of the contracts, which dealt with the supply and installation of large generators at the U.S. Embassy in Kabul, Afghanistan ("USEK"), HERC did not have the engineering experience and personnel for the installation process. It subcontracted the installation work to a firm that was subsequently deemed inadequate. Consequently, the DOS and HERC had to use a second firm (which billed HERC $74,311.05) to make repairs and

potentially paid a premium on the front end to award set-aside contracts without competition. The amount of the actual costs cannot be determined with certainty because: (a) the defendant, while laboring under his conflict of interest, ensured that there were no other bidders or normal competitive processes; (b) HERC and the DOS repeatedly blamed each other for various cost overruns and performance issues, which ultimately caused the DOS to compromise its position and to pay substantial settlement claims, delay costs, and requests for equitable adjustments (totaling approximately $544,338.43); (c) the original award amount on each contract was increased dramatically due to post-award modifications, with a portion of these modifications appearing to address cost overruns (as opposed to ordinary changes to a project's scope); and (d) the DOS reportedly received incomplete performance on one of the contracts, which caused the DOS to take corrective action. Thus, although the amount of the loss is unclear, at least a portion of the cost overruns, repairs, and corrective actions was due to HERC's inexperience and inability to perform rather than legitimate delay caused by the government.

Given the uncertainties associated with the actual costs incurred by the DOS, the government submits that the more straightforward manner to assess cost in this instance is to look at the gain or net profit that HERC received from the contract awards. The Sentencing Guidelines allow a court to use "the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1, cmt. 3(B). *See also United States v. Offill*, 666 F.3d 168, 180 (4th Cir. 2011) (using gain as an alternative measure of loss for guideline purposes in securities fraud case). In calculating gain, however, the government recognizes that there should be an offset or credit here for the fair

---

corrections and to complete the installation process. Likewise, in 2014, the DOS incurred additional costs to complete HERC's construction of a pre-fabricated building at the USEK, including electrical work and the installation of a fire suppression system.

market value of services rendered by HERC to the DOS before the offense was detected. *Id.* at cmt. 3(E)(i).

Unlike the actual loss amount incurred by the DOS, the net gain in this case is easy to calculate when looking at HERC's invoices, the DOS's procurement files (including DOS payment records), and HERC's own QuickBooks, which set forth HERC's net profit on each contract, including each itemized modification. The defendant has specifically admitted that he used his official position to assist HERC in obtaining two contracts: (1) a set-aside purchase order in which HERC, due to its HUBZone certification, was selected to construct a prefabricated building at the USEK to install radio systems in USEK vehicles (Purchase Order No. SAQMMA12C0255); and (2) a contract to supply two power generators to the USEK, which was subsequently modified to include the supply and installation of additional generators (Contract No. SAQMMA12M2357). Including modifications, it is undisputed that HERC received a gross profit of approximately $3.5 million from these two contract awards. The company's own bookkeeping also reflects that HERC received a net profit of $805,866.50 on the radio repair building purchase order and $566,630.11 on the contract to supply and install generators at the USEK. A summary of these numbers are set forth below.[8]

| Contract | Description | Actual Revenue | Actual Costs | Profit |
|---|---|---|---|---|
| SAQMMA12M2357 | Engines | $ 2,265,220.43 | $ 1,459,353.93 | $ 805,866.50 |
| SAQMMA12C0255 | Radio Shop | $ 1,254,030.05 | $ 687,399.94 | $ 566,630.11 |
| Total | | $ 3,519,250.48 | $ 2,146,753.87 | $ 1,372,496.61 |

---

[8] The government made HERC's QuickBooks, including certain spreadsheets generated from the software, available to the defendant.

### B. The Defendant Should Not Receive a Downward Variance, Particularly Given the Egregious Nature of the Conduct and His Abuse of Public Trust

The defendant's admissions, as well as the voluminous investigative record, demonstrate a profound abuse of public trust. The procurement fraud scheme executed here is perhaps the most insidious type because it is difficult to detect. The defendant's position afforded him considerable discretion and latitude when exercising his official duties. He was entrusted to negotiate and acquire a substantial amount of materials, supplies, and construction services for the DOS so that the DOS could fulfill its mission in warzone areas in an expeditious manner. The contracts assigned to the defendant typically involved millions of dollars, and he was required to negotiate with numerous international construction companies in a fast-paced working environment with limited oversight.

As a long-standing public servant, the defendant should have realized that public service is a public trust, and that procurement officials must always place loyalty to the Constitution, federal laws, and core principles of ethics above private gain. By selling out his position and lining his own pockets, the defendant breached the bond of trust bestowed upon him. Over a multi-year period, the defendant intentionally sought to defraud his employer, the United States, by steering contracts to a company in which he was involved in and in which he stood to make a private gain. The defendant and his co-conspirator took substantial steps to conceal their illicit activity and the defendant's conflict of interest. Under the circumstances, applying Level 19 as the guideline range is sufficient, but not greater than necessary, to comply with the purposes set forth in section 3553(a). Anything less would not adequately reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, or adequately deter other procurement officials from engaging in similar deceit and fraud.

## III. Conclusion

For the foregoing reasons, the government respectfully submits that: (1) the Court should apply Level 19 as the total offense level based on a loss amount of $1,372,496.61, and (2) the defendant should not receive a downward variance under section 3553(a).

Dana J. Boente
United States Attorney

By: *[signature]*

Edward P. Sullivan
Special Assistant United States Attorney (LT)
Jack Hanly
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: (703) 299-3700
Tel: (202) 514-1412
Fax: (703) 299-3981
Edward.P.Sullivan@usdoj.gov
Edward.Sullivan@usdoj.gov
Jack.Hanly@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorney of record for the defendant.

_/s/ Edward P. Sullivan_
Edward P. Sullivan
Special Assistant United States Attorney (LT)

Dated: January 12, 2018